J. S. SAUNDERS v. M. A. LISCHKOFF

188 So. 815.
Division B.
Opinion Filed May 5, 1939.
Rehearing Denied June 1, 1939.

*R. H. Merritt, Philip D. Beall* and *Philip D. Beall, Jr.,* and *Carl T. Hoffman,* for Plaintiff in Error;

*Watson & Pasco & Brown,* for Defendant in Error.

PER CURIAM.—This is a case of malpractice. The record shows that the defendant during the year 1934 was a medical doctor and an ear, eye and throat specialist engaged in the active practice of his profession in the City of Pensacola, Florida. The plaintiff, a man of a little more than fifty years of age, consulted and employed the defendant to diagnose an eye ailment or affliction with which he was suffering, and to treat, attend and care for him. The relation of physician and patient existed from April, 1934, until about December of the same year, when another eye specialist by the name of Dr. McLane was called.

The left eye of the plaintiff was giving him trouble and gradually growing worse when he consulted and employed

the defendant around April 1, 1934. It was not thought at the time that the eye of the plaintiff was in such a serious condition but what it would readily yield to the proper treatment. The plaintiff, with the approval of the defendant, went to a general practitioner of medicine by the name of Dr. Bryans for a general "check-up" of the health of the plaintiff and the result thereof was to be reported to the defendant, as it was thought or believed that such information would prove beneficial to the defendant in determining the cause, or causes, of the ailment of the eye of the plaintiff which defendant had undertaken or agreed with the plaintiff not only to diagnose, but to treat and care for him while so doing.

Dr. Bryans made several examinations of the plaintiff, but in each instance failed to find any serious physical defects other than blood pressure a few points high for a person of plaintiff's age, and so reported his findings to the defendant. It was the custom of the plaintiff to visit defendant's office about three times each week for observation and treatment. The plaintiff usually drove his car from where he made his home to the defendant's office, and, while the left eye was being treated, the right eye was in such condition that it enabled him to drive his car through the congested traffic on the streets of the City of Pensacola.

On May 22nd or 23rd, plaintiff went to the defendant's office in a car driven by another person. The defendant gave plaintiff's eye the usual treatment, and he was then requested to examine the right eye of plaintiff, which was done; and defendant at the same time administered some treatment to the right eye, and from then on it never cleared, and excruciating pain and agony was felt by the plaintiff. Plaintiff lost his sight sometime in June and continued to be treated by the defendant until October,

his pain and agony became so intense that it was impossible, because of his physical condition, to continue his visits to the office of the defendant. The plaintiff testified he tried to get the defendant to visit him during the months of October and November, 1934, at his home, but he refused so to do. Mrs. Zur Linden corroborated plaintiff's statement on this point, but the defendant denied he had been requested so to do by the plaintiff. Mrs. Linden testified that she telephoned the defendant to come out to her house and treat his patient, but this fact was denied by the defendant. Dr. Bryans visited the plaintiff some two or three times and found him nauseated and weak, and also found him suffering with severe pains in his head and this condition was reported to the defendant. Plaintiff was organically sound and Dr. Bryan's report to the defendant sustained this conclusion. The responsibility of diagnosing the ailments and treating the eyes of the plaintiff was on the defendant.

Defendant diagnosed plaintiff's ailment as plastic iritis and treated the ailment with atropine, the recognized standard remedy or treatment for same. When atropine is used the patient should be seen by the physician so he can check or test the patient's "tension" or pressure. If a patient appears to be hypersensitive to atropine, or any other drug, due care requires that a close check be kept and the drug changed so as not to cause the patient pain or agony.

Dr. M. E. Quinn testified, viz.: "When I prescribe atropine, that is, applied in the office, and give a man 2% prescription, in order to check his eyes to see if tension or pressure is developed, I insist that my patient come to see me, or I go to see them, or that they get another doctor, that is, if they are over forty years * * *. When a man is over fifty, where I have given him a treatment in the office of atropine and prescribed 2% atropine, I give him

the prescription to use himself, I insist that I see him within forty-eight to seventy-two hours. If I prescribed atropine and did not see the man for ten days, I would tell him to get another doctor. Yes, indeed, I would first inquire. If they don't show up, I think they are doing all right. If they are using atropine, I would say, 'Come back.' "

Mr. McLane testified that he examined plaintiff on December 1, 1934, at his home on East Pensacola Heights. He was then suffering with glaucoma, which is the hardening of the eyeball. An eye having glaucoma is first observed to be red and later it will look white. The eyeball may or may not change its shape, but the tendency is to push the eyeball outward. Plastic iritis is an involvement of what we call the color part of the eye with adhesions. If glaucoma is found in its early stages, there is a remedy for it either by drugs or surgery. If atropine is used, diligence is required in observing the patient when it is being administered. The physician should see and observe his patient every forty-eight to seventy-two hours when atropine medication is applied by the patient. The following question was propounded by counsel for plaintiff but an objection thereto was sustained by the trial Court: "Q. Doctor, from his condition of the glaucoma and with a hypothesis that in July and September a layman observed the conical shape and pressure of his eye, how long would you say that glaucoma had existed at the time you saw him?"

The patient was being treated with atropine and was in such physical condition that he could not go to the office of his physician for treatment, but would talk to him over the telephone. The following question was propounded by counsel for plaintiff and an objection thereto sustained by the trial Court, viz.: "Q. Under the custom among

the doctors in Pensacola, eye specialists, would or would not the failure to go to a person for two months period, when called, be a violation of the duties of a doctor?" The evidence shows that it was possible for a patient suffering with the disease of plastic iritis to have the disease or ailment develop into glaucoma, a hardening of the eyeball, resulting in the loss of vision.

The negligent diagnosis and unskillful treatment and failure to professionally attend the plaintiff are set forth in the declaration, viz.:

"Fourth Count. That defendant then and there entered upon such employment and then and there diagnosed the ailment of the plaintiff's eyes as glaucoma, and then and there negligently and carelessly, through lack of care, prescribed a certain remedy in the treatment thereof that was not the right or proper treatment for the alleviation of suffering caused by such ailment or the cure thereof, but one that would increase the pressure and suffering, and not one that would relieve or alleviate the condition of said organ, but one that would aggravate and accelerate the ailment, all of which was negligently and carelessly done and performed, whereby and by said carelessness and negligence, the plaintiff was caused to suffer untold and unnecessary physical and mental pain and anguish, and his eyes injured instead of improved, and was caused to become totally and permanently blind therein, and to lay out large sums in treatment and medical attention in an attempt to alleviate the great suffering brought on by defendant's said action, and to be permanently disabled. * * *"

"Fifth Count. * * * and instead of alleviating plaintiff's suffering and deferring the diminishing of loss of sight, caused him excruciating physical and mental pain and suffering and caused him to go blind, totally and per-

manently, more rapidly than he, with proper treatment, would have been blinded."

"Sixth Count. * * * that defendant then and there entered upon such employment and then and there diagnosed the ailment of plaintiff's eyes as plastic iritis, and then and there began treating plaintiff therefor, such treatment and the drug or medicine used and prescribed therefor being such as would increase the pressure in plaintiff's eyes; that defendant treated the plaintiff in such an unskillful, careless and negligent manner that by reason thereof the plaintiff was caused to suffer untold and unnecessary physical and mental pain and anguish and his eyes injured instead of improved, and was caused to become totally and permanently blind therein * * *"

"Seventh Count. * * * that defendant then and there entered upon such employment and then and there diagnosed the ailment of plaintiff's eyes as plastic iritis, and then and there began treating plaintiff therefor, such treatment and the drug or medicine used and prescribed therefor being such as would increase the pressure in plaintiff's eyes; that defendant in such treatment so unskillfully, negligently and carelessly conducted himself that by reason of such unskillfullness, negligence and carelessness plaintiff became afflicted with glaucoma, whereby and by reason of said carelessness and negligence the plaintiff was caused to suffer untold and unnecessary physical and mental pain and anguish, and his eyes injured instead of improved, and was caused to become totally and permanently blind therein * * *"

The defendant filed pleas: (a) not guilty; (b) denied that he diagnosed plaintiff's ailment as glaucoma; (c) denied that any improper treatment on the part of the defendant caused plaintiff's blindness. The Court below sustained

a motion for a directed verdict for the defendant on Counts Four and Five at the close of plaintiff's case, and at the close of the entire case the trial court granted or sustained a motion for a directed verdict for the defendant on Counts Six and Seven. A motion for a new trial was made and denied and a writ of error taken to this Court from a final judgment for the defendant below. The case here turns on the question of whether or not there is sufficient evidence of negligence on the part of the defendant, and this point is fully raised by the three rulings on the motions *supra*.

This Court has frequently held that in equity as well as at law, every presumption is in favor of the rulings of the trial Court and it is the duty of a party resorting to an appellate court to make the error complained of clearly to appear. See McMillan v. Warren, 59 Fla. 578, 52 So. 825; Theisen v. Whiddon, 60 Fla. 372, 53 Sou. 642; Stover v. Stovall, 103 Fla. 284, 147 So. 249. The burden of proof in the case at bar was on the plaintiff to show a causal connection between the injuries complained of and the negligence of the defendant. If the defendant was negligent in the manner in which he examined and treated the plaintiff, or in his failure to render proper treatment, and this negligence was the proximate cause of the plaintiff's injury, then plaintiff, as a matter of law, is entitled to recover. See Gower v. Davidian, 212 N. C. 172, 193 S. E. 28. In the case of Ewing v. Goode, 78 Fed. 442, the late Justice Taft, speaking for the Court, said:

"In this case the petition of Nellie Ewing, the plaintiff, alleges that she employed the defendant, Goode, a surgeon and oculist, to cure her of a certain malady of her eye, for a reward to be paid therefor; that defendant entered upon such employment, but did not use proper care and skill in the operation on the eye of plaintiff, and did not bestow

proper attention and treatment upon the eye after the operation, causing her to suffer great pain, and to lose the right eye entirely, and to impair the sight of her left eye. The answer of the defendant denies unskillfulness or lack of attention on his part and any injury to the plaintiff caused thereby.

"It is well settled that in such an employment the implied agreement of the physician or surgeon is that no injurious consequences shall result from want of proper skill, care, or diligence on his part in the execution of his employment. If there is no injury caused by lack of skill or care, then there is no breach of the physician's obligation, and there can be no recovery. Craig v. Chambers, 17 Ohio St. 253, 260. Mere lack of skill, or negligence, not causing injury, gives no right of action, and no right to recover even nominal damages. This was the exact point decided in the case just cited.

"In Hancke v. Hooper, 7 Car. & P. 81, Tindal, C. J., said:

" 'A surgeon is responsible for an injury done to a patient through the want of proper skill in his apprentice; but, in an action against him, the plaintiff must show that the injury was produced by such want of skill, and it is not to be inferred.'

"Before the plaintiff can recover, she must show by affirmative evidence—first, that defendant was unskillful or negligent; and, second, that his want of skill or care caused injury to the plaintiff. If either element is lacking in her proof, she has presented no case for the consideration of the jury. The naked facts that defendant performed operations upon her eye, and that pain followed, and that subsequently the eye was in such a bad condition that it had to be extracted, establish neither the neglect and unskillfulness of the treatment, nor the causal connection

between it and the unfortunate event. A physician is not a warrantor of cures * * *"

The rule, *supra,* is similarly expressed in 48 Corpus Juris, par. 113, p. 1125-6; par. 115, p. 1128-9, and par. 116, p. 1129:

"(113) 4. WRONG DIAGNOSIS. The patient is entitled to an ordinarily careful and thorough examination, such as the circumstances, the condition of the patient, and the physician's opportunities for examination will permit, and while he does not insure the correctness of his diagnosis, a physician or surgeon is required to use reasonable skill and care in determining through diagnosis the condition of the patient and the nature of his ailment, and is liable for a failure, due to a want of the requisite skill or care, to diagnose correctly the nature of the ailment, with resulting injury or detriment to the patient. So, too, it has been held that if a physician, by the exercise of reasonable care and skill, ought to discover that an ailment is incurable, that it will not yield to usual treatment, and that the patient will not be benefited, and fails to make such discovery and advise the patient thereof, he is guilty of negligence. The fact that information and not medical treatment was sought does not excuse negligence in making the diagnosis. On the other hand, a physician or surgeon is not responsible for a mistake in diagnosis if he uses the proper degree of skill and care * * *"

"(115) 6. ATTENTION TO OR ABANDONMENT OR NEGLECT OF CASE.—a. DUTY AS TO ATTENDANGE. A physician or surgeon, upon undertaking an operation or other case, is under the duty, in the absence of an agreement limiting the service, of continuing his attendance, after the operation or first treatments, so long as the case requires attention; and a surgeon, in his treatment subsequent to

an operation, is required to exercise reasonable and ordinary skill and care. The obligation of continuing attention can be terminated only by the cessation of the necessity which gave rise to the relation of physician and patient, or by the discharge of the physician by the patient, or by the physician's withdrawing from the case, after giving the patient reasonable notice, so as to enable him to secure other medical attendance, a physician having the right to withdraw from a case upon giving the proper notice. As otherwise stated, the rule is that a physician is under the duty of treating a patient so long as the professional relation between them lasts. But a physician called only for a specific occasion or service is under no duty to continue his visits or treatment thereafter. In determining when his attendance may safely and properly be discontinued, a physician or surgeon is bound to use reasonable and ordinary care and skill. A physician who contracts without qualification to treat one person cannot excuse himself for failure to attend on the ground that another patient required his attention.

"(116) b. UNWARRANTED ABANDONMENT: The unwarranted abandonment of a case after its assumption will render a physician or surgeon liable in damages, at least where he does not give reasonable notice, or provide a competent physician in his place; and he is also liable for increased pain and suffering resulting therefrom."

The defendant contended that plaintiff's ailment was iritis during the period of his treatment and that but little tension or pressure was upon his eye, while if the trial court had permitted or allowed Dr. McLane to answer the hypothetical question propounded to him by counsel for plaintiff, a possible conflict or dispute in opinions would have developed. There was a conflict of opinion as to the

appearance of the diseased eye. Likewise an inference could be drawn that the pain and agony suffered by the plaintiff was due to the atropine as prescribed, and that if the defendant had contacted his patient at more frequent intervals this condition could have been alleviated. The custom prevailing in Pensacola among physicians was that the physician should visit his patient when the patient was not physically able to go to the physician's office.

It is not necessary to go into the many conflicting points and details of the testimony offered by the parties. This Court has consistently upheld and carefully guarded the right of trial by jury until it is now recognized by all that the right of trial by jury is a part of our jurisprudence. The power granted to a trial court to direct a verdict during the trial of a cause where sufficient evidence has not been adduced to make out a case should be cautiously exercised so as not to infringe upon the organic right of trial by jury. If the evidence is conflicting or will permit of different reasonable inferences, or if there is evidence tending to prove the issues, it should be submitted to a jury as a question of fact to be determined by it, and not taken from the jury and passed upon by the Court as a question of law. See Hastings v. Taylor, 130 Fla. 249, 177 So. 621; Duval Laundry Co. v. Reif, 130 Fla. 276, 177 So. 726; Talley v. McCain, 128 Fla. 418, 174 So. 841; Cameron, etc. Co. v. Law-Engle Co., 98 Fla. 920, 124 So. 814; McKinnon v. Johnson, 57 Fla. 120, 48 So. 910; Starks v. Sawyer, 56 Fla. 596, 47 So. 513; Florida Cent. etc. R. Co. v. Williams, 37 Fla. 406, 20 So. 558; Southern Exp. Co. v. Williamson, 66 Fla. 286, 63 So. 433, L. R. A. 1916C, 1208; Bass v. Ramos, 58 Fla. 161, 50 So. 945, 138 Am. St. Rep. 105; Wood Lbr. Co. v. Gipson, 63 Fla. 316, 58 So. 364; Paul v. Commercial Bank, 69 Fla. 62, 68 So. 68; Johnson v. Louisville, etc. R. Co., 59 Fla. 305, 52 So. 195;

Williams v. Sherry, 94 Fla. 998, 114 So. 849; German-American Lbr. Co. v. Brock, 55 Fla. 577, 46 So. 740; Atlantic Coast Line R. Co. v. Pelot, 62 Fla. 121, 56 So. 496. See also King v. Cooney-Eckstein Co., 66 Fla. 246, 63 So. 659, Ann. Cas. 1916C, 163; Gunn v. Jacksonville, 67 Fla. 40, 64 So. 435; Davis v. Ivey, 93 Fla. 387, 112 So. 264; Florida East Coast Ry. Co. v. Hayes, 66 Fla. 589, 64 So. 274; Jacksonville v. Glover, 68 Fla. 701, 69 So. 20; Gravette v. Turner, 77 Fla. 311, 81 So. 476; Gulf Refining Co. v. Ankeny, 102 Fla. 151, 135 So. 521.

For the errors pointed out the judgment appealed from is hereby reversed. It is so ordered.

WHITFIELD, P. J., and BROWN and CHAPMAN, J. J., concur.

TERRELL, C. J., concurs in opinion and judgment.

Justices BUFORD and THOMAS not participating as authorized by Section 4687, Compiled General Laws of 1927, and Rule 21-A of the Rules of this Court.