144 So.2d 835 (1962)
Donald P. MICHAELS, a Minor by His Next Friend and Father James T. Michaels, and James T. Michaels, Appellants,
v.
Eugene SPIERS, Appellee.
No. 2987.
District Court of Appeal of Florida. Second District.
September 28, 1962.
Rehearing Denied October 10, 1962.
*836 Albert Yurko, Law Offices of J. Russell Hornsby, Orlando, for appellants.
Monroe McDonald, of Sanders, McEwan, Schwarz & Mims, Orlando, for appellee.
KANNER, Judge.
Summary judgment, here appealed by plaintiffs-appellants, was entered for defendant-appellee in a malpractice negligence action. The complaint charged, essentially, that treatment rendered by appellee, a licensed general practitioner, to the minor appellant, Donald F. Michaels, was so negligently and carelessly performed that as a direct and proximate result, the minor suffered circulatory disturbances in the right leg because of negligent application of a cast and ultimately had to undergo surgery for amputation of the injured member due to the onset of gangrene.
The record reveals that Donald, on April 25, 1959, had sustained accidental injuries involving fractures to the tibia and fibula of the right leg, with an excoriated and abraded surface on the limb about three by four inches.
Appellee filed his motion for summary judgment, supported by his own deposition and that of two other physicians, the deposition of the minor appellant, a summary of the medical testimony which appellee had compiled, and affidavits of three other physicians who, after examining this summary, set out that appellee had followed accepted practices prevailing among general practitioners of the area in treating similar fracture injuries. Against this, appellants submitted the affidavits of four lay persons, including their own, and a copy of the pertinent hospital records.
On the appeal, this court's consideration is directed to the question of whether or not there existed a genuine issue of any material fact so as to preclude summary judgment.
Donald stated in his affidavit that prior to the time the cast was placed upon his leg it was neither swollen nor numb. Afterwards, he averred, it became swollen, numb, and very painful. He complained that the cast felt very tight and that his toes were cramped. Affidavits of three other lay persons indicated, in effect, that during visits to Donald on April 25 and 26, discoloration, coldness, hardness, and puffiness of the toe or toes on the right foot had been observed, and that the patient had complained of the tightness of the cast and the severe pain in his leg.
By the nurses' charts, intermittent cutting of the cast to relieve pressure was noted each day Donald remained a patient of appellee. Notations also indicated resultant but transitory improvement at these times. The first notation that the patient's toes were cold and cyanotic was made at 10:20 a.m., on April 25, ten minutes after he had been put into bed following the application of the cast. Appellee was notified, and the elevation of the foot was lowered. At 11:30 a.m., the toes were still cold and cyanotic. At 2:25 p.m., the house doctor cut the cast by the toes to relieve some of the pressure. There were two further notations that day regarding the coldness, the cyanotic appearance, and the lack of feeling in the toes. On April 26, the toes remained cold and discolored *837 and had become edematous; the cast was cut some more to relieve pressure. On April 27, or the third day, appellee visited Donald at 9:30 a.m. At 5 p.m., on that day the cast was bi-valved by the house doctor, or split on each side to relieve pressure. On the fourth day, April 28, appellee again visited Donald and split the cast around the ankle, after which the patient felt more circulation around the ankle. On the fifth day, or April 29, the right foot was very cold with no feeling in the toes or foot, which were very discolored and cyanotic. At 3 a.m., the cast was trimmed "where appears to be large amounts of pressure also causing pain." Again, some color and feeling were noted in the toes. There were regular notations on the nurses' charts of pain suffered by Donald and the medications given for it.
Medical testimony was given for appellee by the orthopedic surgeon whom appellee initially consulted by telephone and to whose care the patient was transferred on the fifth day and by a vascular surgeon who was also consulted. Each gave as his opinion, in substance, that it was the trauma of the initial injury resulting in soft tissue damage and not the cast applied by appellee which caused the gangrene and resultant amputation. The progressive nature of the circulatory disturbances, according to their medical opinion, indicated that the trouble was caused by arterial spasm, blood clots, or both, brought on by the initial injury.
However, two of the medical witnesses, including appellee, also testified in effect that a cast, if applied too tightly, can cause circulatory disturbances and that circulatory disturbances can lead to gangrene. The orthopedic specialist testified as to this that if the extremity involved were a leg and the circulation were cut off, the time it would take for irreversible circulatory changes to occur would be about 12 to 15 hours. Appellee gave as his opinion the figures 4 to 6 hours.
Appellee, upon the day Donald was admitted to the hospital, had taken x-rays, had sent them to the orthopedic specialist, and had that afternoon consulted him by telephone. Concerning the advice which he then gave, the specialist stated, "I routinely inquire, as I did in this case, regarding the circulatory status of the leg, which is most important with an initial injury," continuing that appellee was able to assure him that "both the dorsalis pedis and the posterior tibial pulsations were good and the circulatory status of the foot was good, with adequate warmth and pinkness." At another point, the orthopedic specialist referred to Donald's foot as "warm and pink, and good pounding pulses." He affirmed, in response to questioning, that he relied on the information given him by appellee in advising him as to what to do, and he testified that he did not remember seeing the cast.
The hospital records contain a notation made by appellee of Donald's condition subsequent to appellee's initial treatment. It shows that the dorsalis pedis pulsation was "fair." There was no notation concerning the posterior tibial pulsation.
By his testimony, appellee stated that when he put the cast on, he was of the opinion there would be little or no swelling and not much likelihood of circulatory impairment. Elsewhere there is testimony by him that in Donald's case there was soft tissue damage, and the statement was made by appellee, "I felt it was sufficient to cause vascular spasms and result in some circulatory trouble." He added that when he put the cast on, he was not aware of the extent but thought of the possibility. When he conferred with the orthopedist, he said, he told him he had put the cast on and the specialist concurred. Appellee testified that he visited Donald several times during April 25 and, since his office was in the hospital, had checked every hour or two for most of the day until the orthopedist called him that afternoon.
The vascular specialist who testified for appellee, in response to direct questioning *838 as to a situation such as Donald's when appellee first saw him, replied that he thought this would be "enough to alert him to think there is a possibility for the swelling and circulatory disturbances to occur * * *". That witness testified that when he first saw the patient, the top half of the cast had been removed.
It is not indicated by the record that any medical witness except appellee saw the entire cast while Donald's leg was encased within it to observe whether it was too tight and, if so, in his opinion based upon first-hand observation, what should have been done. Appellee noted in the brief history contained in the hospital records that a posterior plaster splint was applied and secured by a few rolls of circular plaster.
Appellant is contending on the appeal that the evidence supports his position that there were genuine issues of fact involved. On the other hand, appellee disputes that appellants made out a prima facie case through the evidence presented to show that the cast might have been too tight, urging that the medical testimony and other evidence rebuts the charge that the cast applied by him or treatment administered by him had anything to do with the loss of appellant's leg. Appellee claims instead, that the initial injury causing soft tissue damage, not fully apparent at first, brought about the circulatory disturbances and gangrene resulting in the amputation.
In the case of Atkins v. Humes, Fla. 1959, 110 So.2d 663, 81 A.L.R.2d 590, the Supreme Court, upon certiorari, quashed the decision of this court, Fla.App. 1958, 107 So.2d 253, sustaining summary judgment for the defendant in a malpractice negligence action. The physician in that case was charged with negligence in treating a three year old patient for simple fracture of her elbow, allegedly resulting in permanent injury to her hand known as "Volkmann's contracture." It was held that there had been raised substantial issues of fact which precluded summary judgment, as to whether the physician in that case negligently or unskillfully applied a cast so as to cause a "pressure sore" on the patient's arm resulting in Volkmann's contracture, negligently failed to heed the classic warnings of that ailment while the cast was on the patient's arm and to bi-valve the cast to remove the pressure, and whether such negligence was the proximate cause of the injury.
As to the use of lay and expert testimony in the Atkins v. Humes case, the court commented:
"But it is obvious that no specialized knowledge is needed to observe that a child's hand is swollen or cold or discolored or that she has difficulty in moving her fingers, nor to report that a child constantly complains of pain in her arm."
Continuing, the court then made specific reference to medical as opposed to lay testimony:
"The fact that Dr. Humes and one other physician, a medical doctor, who examined the child while the cast was still on her arm `could discern no signs of nor did they discover the developing of the contracture until removal of the cast,' as stated by the District Court of Appeal in its opinion, is not, in our opinion, conclusive of the question of whether such signs were actually present and should have been discerned and heeded by Dr. Humes, even though the evidence thereof was given by the parents and other laymen."
It was further indicated that, in many instances, jurors who are possessed of ordinary intelligence, sense, and judgment are capable of arriving at a conclusion in a malpractice case as to a charge of negligence in applying or administering an approved medical treatment without the help of expert testimony. Even in cases requiring some expert testimony to show causation, jurors may be authorized to infer *839 from the circumstances that the defendant was negligent in applying an approved medical treatment, notwithstanding absence of direct expert testimony to this effect and in the face of expert testimony to the contrary.
Also in the Atkins v. Humes case, the Supreme Court said, "Since medicine is not an exact science, it is difficult if not impossible, in malpractice cases to arrive at a conviction to moral certainty as to the cause of a pathological condition of a person." Quoting from a prior malpractice decision, Saunders v. Lischkoff, 1939, 137 Fla. 826, 188 So. 815, 820, the court directed,
"If the evidence is conflicting or will permit of different reasonable inferences, or if there is evidence tending to prove the issues, it should be submitted to a jury as a question of fact to be determined by it, and not taken from the jury and passed upon by the Court as a question of law."
Here, the objective notations made by the nurses on their charts tell the skeletal story of Donald's pain, the continuing cold, cyanotic, edematous, and sensation-impaired status of his right foot and toes, the transitory and partial relief afforded through spot-cutting or trimming of the cast from time to time, the failure to bi-valve until 5 p.m., of the third day, and use of the specific term, "pressure" referred to by the charts as existing even after the cast had been bi-valved, with the two halves, as appellee explained the process, secured by elastic bandage or other type of non-rigid material. Appellee, by his own account, visited Donald several times, checking every hour or two for most of the first day until the orthopedic specialist called him about the x-rays of the injured leg. Throughout this first day the cold and cyanotic condition of the toes was present, as was the severe pain; yet the cast was not trimmed for partial relief of pressure until 2:25 p.m.; and until this was done, no improvement in the cyanotic and cold condition, first recorded at 10:20 a.m., or ten minutes after Donald was put to bed, was noted. Thus, from 10:20 a.m., until 2:25 p.m., approximately four hours, there is a period of time during which a doctor visiting Donald every hour or two until the call of the orthopedist in the afternoon of April 25 could have noticed that which the nurse on duty noticed and recorded, could have apprised the orthopedist of this when he inquired specifically of the circulatory status of the foot, or on his own motion could have taken timely steps to remove pressure of the cast which, if too tight, could have resulted in circulatory disturbances and could have been causing the coldness and cyanosis.
Adding to this is the lay testimony indicating that on April 25 and 26 the toes were cold, hard, puffed out, and discolored and that Donald complained of severe pain. As related, the doctors were apparently in accord that a cast too tight can cause circulatory disturbance and that circulatory disturbance can lead to gangrene, which may require an amputation. Additionally, although there were, in the Atkins v. Humes case, doctors who had seen the cast worn by the minor appellant there and who had testified from first-hand observation of it, this was not so in the present case as to the whole cast. Instead, the medical witnesses, except for appellee, had not seen the cast as appellee had applied it, the orthopedist not having been able to recall seeing the cast and the vascular specialist having stated that only the bottom half of the cast was in place when he first saw the patient.
When, through motion for summary judgment, absence of a genuine issue of any material fact is asserted, the movant has the burden of sustaining this, and any doubt as to the existence of such fact must be resolved against him. This is also true as to any inference. Manning v. Clark, Fla. 1954, 71 So.2d 508; Majeske v. Palm Beach Kennel Club, Fla.App. 1959, 117 So.2d 531.
*840 We must, therefore, conclude that the evidence submitted was adequate to preclude the granting of the motion for and the entry of summary judgment. Hence, the judgment must be reversed and the cause remanded for further proceedings.
Reversed and remanded.
ALLEN, Acting C.J., and WHITE, J., concur.